**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                          |        |                      |
|--------------------------|--------|----------------------|
|                          | *      |                      |
|                          | *      |                      |
| ALLSTATE INSURANCE       | *      |                      |
| COMPANY                  | *      |                      |
|                          | *      |                      |
|                          | *      |                      |
| v.                       | *      | Civil No. CCB-11-1846 |
|                          | *      |                      |
|                          | *      |                      |
| JENNIFER WARNS           | *      |                      |
|                          | ****** |                      |

## MEMORANDUM

Allstate Insurance Company ("Allstate") brings this suit against defendant Jennifer Warns,[1] a former Allstate claims adjuster who began working for a plaintiffs' law firm with litigation pending against Allstate's insureds. Allstate seeks monetary and injunctive relief for Warns' alleged breach of fiduciary duty and breach of contract. Now pending before the court are (a) Warns' renewed motion for summary judgment, (b) Allstate's motion to seal its opposition to Warns' renewed motion for summary judgment, (c) Warns' motion to strike Allstate's Exhibit N from its opposition to Warns' renewed motion for summary judgment, and (d) Allstate's motion to seal the declarations of David I. Ackerman and Kenneth J. Pfaehler, submitted in opposition to Warns' motion to strike Exhibit N. The issues in this case have been fully briefed, and oral argument was held on November 7, 2013. For the reasons stated below, the court will grant in part and deny in part Warns' motion for summary judgment, grant in part and deny in part Allstate's motion to seal its opposition, deny Warns' motion to strike Allstate's

---

[1] Jennifer Warns is referred to as "Jennifer Allen" in some of the documents attached to the parties' motions and responses.

Exhibit N, and grant in part and deny in part Allstate's motion to seal the declarations of Ackerman and Pfaehler.

## BACKGROUND

For thirty-three years, from February 1977 to July 2010, Warns worked as a claims adjuster at Allstate's Baltimore Claims Office. She was responsible for handling lead paint liability claims against Allstate's insureds. (Aff. of Michael Kevin Barry, ECF No. 116-16 at ¶ 10.) Initially, Warns handled all the lead paint claims in the office. (*Id.*) But eventually, the caseload became too big for one person, and in June 2004, the lead paint claims were split between Warns and claims adjuster Melynda Tayson. (*Id.*) As a claims adjuster, Warns worked with defense counsel for Allstate and communicated with them regarding strategy, analysis, evaluation, and factual issues in lead paint lawsuits against Allstate's insureds. (*See id.* at ¶ 14; Aff. of Benjamin L. Kirson, ECF No. 116-43 at ¶¶ 11–12; *see also* Warns tr., ECF No. 116-2, at 186:6–190:3.)[2] Warns also maintained files from the early 1990s to 2010 on the lead paint litigation; those files included lists of properties owned by Allstate's insureds and information regarding lead paint testing, lead paint violation notices, and insurance coverage on the properties. (*See* Aff. of Barry at ¶¶ 8, 10, 19.)

---

[2] Warns initially stated that she "did not participate in the formulation of strategy," (First Decl. of Jennifer Warns, ECF No. 15-1 at ¶ 53), but according to her supervisor at Allstate, she requested legal advice from attorneys at various law firms, requested and received legal memoranda related to lead paint litigation, decided with counsel whether to bring certain cross-claims and counter-claims, and was consulted on an appeal in a lead paint matter. (*See* Decl. of Barry, ECF No. 116-19 at ¶ 10.) Similarly, Warns claimed in her first declaration that she "knew nothing about discovery or the strategy or tactics governing it," (First Decl. of Warns at ¶ 51), but according to her supervisor, Warns attended depositions of witnesses and requested other deposition transcripts. (*See* Decl. of Barry at ¶¶ 9, 10b, 10c, 10e.) There are other inconsistencies between Warns' initial description of her work at Allstate and her supervisor's description of her work. (*Compare* First Decl. of Warns at ¶ 52 (claiming that she was not involved in selecting or evaluating experts), *with* Decl. of Barry at ¶ 11f (suggesting that Warns was involved in the analysis of an expert witness for Allstate).)

As a condition of her employment, Warns did not sign a noncompete agreement, but she acknowledged her receipt of the Allstate Code of Ethics ("Code of Ethics" or "Code"), and her agreement to it, in both 2009 and 2010. (*See* 2009-2010 Annual Compliance Confirmation, ECF No. 116-10; 2010-2011 Annual Compliance Confirmation, ECF No. 116-11.) The Code of Ethics provided in relevant part that: "Allstate considers employees' and customers' personal data to be confidential information and information assets. As such, when working with this data, employees and other authorized users must take necessary precautions to ensure the protection and privacy of this confidential information." (Code of Ethics, ECF No. 116-5, at 34.) The Code of Ethics also stated that the Allstate employee is "responsible for safeguarding all information under your control," and this information may only be shared with "people with a legitimate need to know." (*Id.* at 24.) It further admonished: "You may not appropriate for your own personal benefit information in which Allstate has a proprietary interest. You or another person may not derive personal benefit from confidential or 'inside information' that you obtained in the course of your work." (*Id.* at 19.)

Allstate first heard of Warns' relationship with David Albright, Jr.—an attorney at Bennett & Albright, P.A.,[3] who represents plaintiffs in lead paint litigation, including cases against Allstate—in July 2009. (Aff. of Melynda Tayson, ECF No. 116-38 at ¶ 9.) Around that time, Warns had hosted a party at her home. (*Id.*) Among those in attendance were Albright and other members of the plaintiffs' bar. (*Id.*; *see also* Aff. of Barry at ¶ 25.) On July 14, 2009, Allstate managers met with Warns to counsel her regarding the Code of Ethics and to tell her not to repeat the event. (Aff. of Barry at ¶ 25; *see also* Aff. of Barry, Ex. B., ECF No. 116-18.) Specifically, Allstate managers advised Warns that even innocent actions may have the

---

[3] At that time, the firm was known as Bennett & Albright, P.A. The firm was later called The Law Offices of David Albright, Jr.

appearance of wrongdoing, and unauthorized conversations with plaintiffs' attorneys regarding ongoing lead paint litigation may jeopardize Allstate's defense in those matters. (Aff. of Barry, Ex. B.) During this conversation with Allstate managers, Warns did not disclose her social relationship with Albright. (*See* Warns tr. at 389:6–390:7.)

Later deposition testimony and an affidavit revealed that Warns and Albright had a social relationship around the time of Warns' conversation with Allstate managers. (*See id.* at 389:22–390:11; Albright tr., ECF No. 116-3, at 47:18–48:2.) According to Warns, she first met Albright in 2000, and by 2009, they were meeting on a social basis at least monthly. (Warns tr. at 380:3–8, 382:14–18.) While Warns was still employed at Allstate, she and Albright would meet for dinner or to go for walks. (*Id.* at 381:21–382:3; *see* Albright tr. at 157:17–158:19.) According to Tayson, from about fall 2009 to the beginning of July 2010, Warns showed her items—including cards, flowers, cookies, and candies—that Albright had sent to her. (Aff. of Tayson at ¶ 10.) Warns and Albright both maintained that, during their social meetings, they only discussed personal matters and did not discuss anything related to Allstate. (Warns tr. at 381:21–382:8; Albright tr. at 157:20–22, 158:22–159:2.)

Warns submitted her resignation from Allstate on June 9, 2010, and remained employed there until July 2, 2010. (Aff. of Barry at ¶ 31.) She told colleagues at Allstate that she was leaving for personal reasons, including her divorce; she did not mention any plans to take a position at Bennett & Albright. (*See id.*; *see also* Aff. of Tayson at ¶ 14.) Less than a week after Warns left Allstate, Tayson, an Allstate co-worker, could not locate the files Warns kept on lead paint litigation. (Tayson tr., ECF No., 116-8, at 70:2–71:17, 75:12–15.) According to Tayson, there were "approximately one to one a half drawers full of these documents." (*Id.* at 70:12–13.) Moreover, Tayson maintained that "[t]here was no reason for anyone else to take" the folders, as

she and Warns were the only two adjusters in the office who handled lead paint litigation.  (*See id.* at 75:16–76:10.)  According to Peter Farquharson, an Allstate supervisor, a "blue binder" containing "information that [Warns] had gathered over the course of many years of handling lead paint, especially with Stanley Rochkind" also went missing from the office after Warns' departure from Allstate.  (Farquharson tr., ECF No. 116-9, at 26:7–17, 28:6–10, 66:17–19.)

After her resignation Warns attempted to operate a home business, but later she was hired by Albright to work at Bennett & Albright.  (*See* Warns tr. at 46:17–49:3, 133:3–9.)  Albright maintained that he did not want Warns doing "secretarial work" at the firm.  (*Id.* at 46:14–47:5.)  Rather, according to Albright, Warns was hired to work on uninsured claims.  (Albright tr. at 45:17–22.)  Before Warns was hired, Bennett & Albright did not employ anyone whose only task was to work on uninsured cases.  (*Id.* at 46:1–4.)

In the three years prior to Warns' departure from Allstate, Bennett & Albright filed approximately fifty-five lead paint cases against Allstate's insureds, (*see* Allstate's Supplemental Objections and Answers, Ex. 3, ECF No. 116-4); in the two years following Warns' departure from Allstate, the firm filed more than one hundred lead paint cases against Allstate's insureds.  (Barry tr., ECF No. 116-7, at 65:11–18.)  Over thirty cases were filed against Rochkind, an Allstate policy holder.  (*See* Allstate's Supplemental Objections and Answers, Ex. 3.)  Several other cases named Benjamin Kirson, an Allstate insured who owned rental properties in Baltimore, as a defendant.  (*See* Allstate's Third Supplemental Objections and Answers, Ex. 2, ECF No. 116-6.)  Although Michael Barry, Warns' former direct supervisor at Allstate, believed that the increase in cases indicates that Warns helped Albright in Allstate matters, he offered no direct proof that Warns shared confidential information gathered from her employment at Allstate.  (*See* Barry tr., Ex. 5, ECF No. 111, at 67:13–71:20.)  Likewise, although Kirson was

concerned that Warns shared confidential information gleaned at Allstate with her new employer, he offered no evidence that this was taking place. (*See* Aff. of Kirson at ¶ 28.) Farquharson also believed that Warns shared confidential Allstate information with Albright, but could offer no proof that she disclosed this information. (*See, e.g.*, Farquharson tr., Ex. 7, ECF No. 111, at 83:19–85:1.)

Albright provided a number of reasons for the increase in litigation against Allstate, unrelated to Warns joining the firm. For instance, Albright uses a proprietary search engine, which provides the names of tenants at a particular property known to have chipping, peeling, and flaking paint. (*See* Albright tr., Ex. 4, ECF No. 111, at 131:1–132:3.) Once the search engine identifies the tenants that have lived at the property, Albright's firm sends letters to the potential clients. (*Id.* at 133:15–134:3.) Albright also receives referrals from other lawyers. (*Id.* at 185:11–16.) Finally, in August 2008, Albright hired his mother, Jodie Albright, to increase the volume of his business by establishing leads on possible claims with ministers, heads of community groups, community activists, and other individuals and organizations. (*Id.* at 27:5–10, 114:3–115:1.)

During Warns' tenure at Bennett & Albright, few measures were taken to ensure she did not work on cases involving Allstate. For instance, files involving Allstate's insureds were not segregated or marked with a warning that they should not be accessed by Warns. (Albright tr., ECF No. 116-3, at 168:15–18, 285:14–22.) According to Albright, he was unaware of any effort to prevent Warns from accessing Allstate matters on the firm's case management system. (*Id.* at 168:19–169:3.) In addition, attorneys at the firm were not told to refrain from discussing Allstate matters with Warns. (*See id.* at 284:8–285:12; *see also id.* at 167:4–8.) Indeed, in June 2011, Albright sent an email to Warns regarding a negotiation for settlement of multiple Allstate

cases. (*See* Email to Jen Allen, ECF No. 116-12.) Warns also was involved in cases where Rochkind was a defendant. (*See, e.g.*, Email to Jackie Pena, ECF No. 116-13.)

Similarly, Warns was involved in the *Fulgham* trial in which Patrick Connor—a lead paint expert with whom Warns had worked while at Allstate—testified for the defense. (*See* Warns tr. 646:20–648:5; *see also* Opp'n to Mot. for Summ. J., ECF No. 116, at 50.)[4] The parties agree that, during the *Fulgham* trial, Albright cross-examined Connor using a particular exhibit, but they do not appear to agree on whether Warns obtained the exhibit from Connor during her employment at Allstate. (*Compare* Mot. for Summ. J., ECF No. 111, at 5–6, *with* Opp'n to Mot. for Summ. J. at 49–51.) According to Warns, she obtained the exhibit from a manufacturer. (*See* Mot. for Summ. J. at 6; *see also* Albright tr., Ex. 4, ECF No. 111, at 41:8–41:13.) Allstate, however, suggests that Warns obtained the exhibit when she attended a March 2008 meeting at Rollins, Smalkin, Richards & Mackie, LLC, during which Connor gave a presentation. (*See* Opp'n to Mot. for Summ. J. at 49–51; *see also* First Decl. of Warns at ¶ 19.)

The court denied Warns' motion to dismiss or for summary judgment on February 29, 2012. The parties then proceeded to discovery, and on October 15, 2012, the court denied without prejudice Warns' motion for summary judgment. On April 2, 2013, Warns filed a renewed motion for summary judgment. Allstate responded on April 26, 2013, and also moved to seal its response. On June 6, 2013, Warns moved to strike Allstate's Exhibit N from its response in opposition to Warns' motion for summary judgment. Allstate filed its opposition to Allstate's motion to strike on June 24, 2013, and additionally, moved to seal the accompanying declarations of Ackerman and Pfaehler. The court held oral argument on November 7, 2013.

---

[4] Allstate was not a party to the *Fulgham* case.

**ANALYSIS**

**a. Motion for Summary Judgment**

Warns moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

In support of her motion for summary judgment, Warns attempts a number of general legal arguments, but none of the arguments may stand. Warns claims that the First Amendment bars Allstate's claims, but Allstate is correct that she offers no explanation for why this is so. Furthermore, the court can find no reason why any potential injunction preventing Warns from

8

sharing confidential Allstate information would constitute an impermissible prior restraint on speech. *Cf. Jakanna Woodworks, Inc. v. Montgomery Cnty.*, 344 Md. 584, 600, 689 A.2d 65, 72 (1997) (citation omitted) ("A scheme that places unfettered discretion in the hands of a government official or group to grant or deny a permit or license to engage in a right that is guaranteed by the First Amendment is an impermissible prior restraint on speech."). Allstate also is correct that Warns offers no support for the argument that the court lacks jurisdiction over the present action. It is unclear whether Warns disputes personal jurisdiction in this matter. Nevertheless, Warns waived this argument when she did not include it in her earlier motion to dismiss. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982).[5] The court is particularly perplexed by Warns' argument that Allstate does not have standing to protect its insureds' privileges; the court has already ruled on this issue and explained why this is not so. (*See* Op., ECF No. 107.) Finally, as to Warns' argument that Allstate's claims are barred by the Maryland Uniform Trade Secrets Act ("MUTSA"),[6] Warns undercuts her own argument by outlining in detail why each document at issue in the current litigation does not qualify as a "trade secret" and thus falls outside of MUTSA protection. Allstate agrees with Warns' assessment that this case does not involve trade secrets. In the absence of any dispute as

---

[5] Of course, the court has a continuing duty to assess its subject matter jurisdiction.

[6] The MUTSA governs cases involving trade secrets, defined as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md. Code Ann., Com. L. § 11-1201(e); *see also LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 305, 849 A.2d 451, 461 (2004) ("With a few enumerated exceptions . . . , the Maryland Uniform Trade Secrets Act currently provides the exclusive civil remedy for misappropriation of a trade secret . . . .").

to whether MUTSA applies, the court declines to rule on the matter.  Accordingly, the court must move on to whether there is a genuine factual dispute.

### 1. Breach of Fiduciary Duty

Under Maryland law, "there is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries," but "[t]his does not mean that there is no claim or cause of action available for breach of fiduciary duty." *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509, 521 (1997).  Indeed, the weight of authority suggests there is a cause of action for breach of fiduciary duty, continuing after the termination of employment, not to misappropriate or disclose confidential information obtained during employment.  *See, e.g.*, *NCH Corp. v. Broyles*, 749 F.2d 247, 254 (5th Cir. 1985) (citation omitted); *Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 661–62 (E.D. Va. 2002); *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 137 (E.D.N.Y. 1997) (citation omitted).  To pursue a claim for breach of fiduciary duty, counsel must "identify the particular fiduciary relationship involved, identify how it was breached, consider the remedies available, and select those remedies appropriate to the client's problem." *Kann*, 344 Md. at 713, 690 A.2d at 521.  Since *Kann*, a successful claim for breach of fiduciary duty may result in injunctive relief but not in monetary damages.  *See Wasserman & Wasserman Goldsten Family LLC v. Kay*, 197 Md. App. 586, 630–32, 14 A.3d 1193, 1219 (2011) (citations omitted).  Where there is no noncompete agreement between the employee and the employer, the employee's right to compete after termination is limited only by misuse of trade secrets or confidential information. *Dworkin v. Dworkin*, 77 Md. App. 774, 781, 551 A.2d 947, 950 (1989).

The court first considers the available remedies for Warns' alleged breach of fiduciary duty.  During the November 7, 2013, hearing, counsel for Allstate conceded that screening

measures are likely the appropriate remedy, rather than barring Warns from working for Bennett & Albright.  In any event, the court concludes that injunctive relief preventing Warns from working for Albright, Bennett & Albright, or other attorneys representing lead paint plaintiffs is not appropriate in light of the fact that there is no noncompete agreement between Warns and Allstate.[7]  Instead, in the absence of a noncompete agreement, Allstate may only obtain relief to prevent the misuse of confidential information.  Thus, to the extent Allstate seeks to bar Warns from working for Albright, Bennett & Albright, and other lead paint law firms, Warns' motion for summary judgment will be granted.[8]

The court moves on to determine whether the information Warns allegedly provided to Bennett & Albright, qualifies as confidential information.  Whether information is deemed

---

[7] Even if there were a noncompete agreement between Warns and Allstate, the agreement likely could not reasonably limit her ability to work for Albright, Bennett & Albright, or other law firms representing lead paint plaintiffs.  In Maryland, courts will enforce noncompete agreements only if "their terms are reasonable in light of the interests of the employer, the employee, and the general public." *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001).  The court considers three factors to determine whether the agreement is reasonable: "(1) whether restraint is necessary for the protection of the business or goodwill of the employer, (2) whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether the degree of injury to the public is such loss of the service and skill of the employee as to warrant nonenforcement of the covenant." *Id.* (citation and internal quotation marks omitted).  A noncompete agreement should, in short, cover no more activity than is necessary to protect the employer's business and goodwill. *Id.*  Here, a restriction on Warns' employment with Albright, Bennett & Albright, and other lead paint law firms would fail factor (2).  There are more narrow means available to secure Allstate's business or goodwill, such as screening measures at Bennett & Albright.  Appropriate screening measures might include: barring Warns from working on litigation involving Allstate and its insureds, marking and/or segregating files involving Allstate and its insureds, and instructing lawyers and other employees of the law firm not to discuss matters involving Allstate and its insureds with or around Warns.  The court encourages the parties to consult to determine whether they might agree on appropriate screening measures.

[8] The court rejects, however, Warns' argument during the November 7, 2013, motions hearing that Allstate may not seek screening measures because it was Albright, not Warns, who failed to set up screening.  Warns is the one with the fiduciary duty to Allstate, not Albright.

confidential depends upon the applicable facts.  *See Dworkin v. Blumenthal*, 77 Md. App. 774, 781, 551 A.2d 947, 950 (1989).  The court in *Dworkin* considered:

> (1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in [the employer's] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his competitors; (5) the amount of effort or money expended by [the employer] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* at 781–82, 551 A.2d at 950 (citation omitted).  Thus, for example, a list of customers may be considered confidential and even a trade secret.  *See Home Paramount Pest Control Cos., Inc. v. FMC Corp. / Agric. Prods. Grp.*, 107 F. Supp. 2d 684, 692 (D. Md. 2000); *Dworkin*, 77 Md. App. at 781, 551 A.2d at 950; *see also* Restatement (Second) Agency § 396(b) ("[A]fter termination of the agency, the agent . . . has a duty to the principal not to use or to disclose . . . written lists of names, or other similar confidential matters . . . .").

The lead paint files, covering lead paint litigation from the early 1990s to 2010 and that Warns allegedly provided to Bennett & Albright, qualify as confidential information.  The files contained lists of properties owned by Allstate's insureds and information regarding lead paint testing, lead paint violation notices, and insurance coverage on the properties.  The list of properties owned by Allstate's insureds would constitute valuable information for Bennett & Albright, as it would identify potential targets for lead paint litigation.  Moreover, although it is true that in litigation defendants might have to disclose with whom they are insured and their policy number, (*see* Farquharson tr., Ex. 7, ECF No. 111, at 31:12–33:18), the court cannot find this information is readily available prior to litigation.  (*See id.* at  44:15–45:12 (explaining that, for Warns to compile a list of properties owned by one of Allstate's insureds, she had to call the Allstate Claim Support Office and then wait for that office to research, find, and send the

policy).)  The court also notes that the list of properties owned by Allstate's insureds was compiled over a period of about twenty years, suggesting a significant amount of effort was expended in gathering this information.  Taken together, the above factors suggest the lead paint files, compiled by Warns from the early 1990s to 2010, are confidential.

The court is even more concerned about the information Warns possesses regarding Allstate defense strategies.  Over the course of thirty-three years of employment at Allstate, Warns worked and communicated extensively with defense counsel and was privy to litigation and settlement strategies.  She requested legal advice from defense counsel, worked with defense counsel to decide to bring cross-claims and counter-claims, attended witnesses' depositions, and was consulted on an appeal.  The information Warns gathered while working with Allstate's counsel is not known outside the employer's business and, indeed, is not likely known to many employees within the business: Warns was one of only two adjusters in her office working on lead paint claims.  It is the kind of information that would be valuable to adversaries in litigation but is not easily obtainable.  In short, the information Warns gathered from working closely with Allstate defense counsel is certainly confidential, if not privileged.

Having determined that the information qualifies as confidential, the court turns to whether there is any genuine dispute that Warns provided this information to Bennett & Albright.  While not conclusive, Allstate's proffered evidence, taken as a whole and considering credibility issues to be resolved by the trier of fact, is sufficient to permit the case to go forward.  First, as explained above, it is clear Warns had access to confidential information while at Allstate.  As to the lead paint files, Warns denies that she took them.  According to Allstate, however, the files were missing after Warns' departure, and she was one of only two people with reason to access them.  Allstate urges the court to consider those two facts in combination with

the increase in cases filed by Bennett & Albright against Allstate, the lack of measures to screen Warns from Allstate matters, and Warns' involvement in Allstate matters at Bennett & Albright. Considering all those facts in the light most favorable to the non-movant, Allstate, the court determines that Allstate has proffered enough evidence to raise a genuine dispute as to whether Warns shared confidential information with Bennett & Albright. The court is also concerned that Allstate's confidential information continues to be at risk in the absence, which is not disputed, of any measures to screen Warns from matters involving Allstate and its insureds. Thus, Warns' motion for summary judgment as to breach of fiduciary duty will be granted in part, as to Allstate's attempt to bar Warns from working for Albright, Bennett & Albright, and other lead paint firms, and otherwise denied.

### 2. Breach of Contract

In Maryland, the elements of a breach of contract action are: (1) the defendant owed the plaintiff a contractual obligation; and (2) the defendant breached that obligation. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001) (citation omitted). In Maryland, a plaintiff alleging breach of contract need not "prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though he has failed to prove actual damages." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001) (citations omitted); *see also PFB, LLC v. Trabich*, 304 Fed. App'x 227, 228 (4th Cir. 2008) (citation and internal quotation marks omitted).[9] Put another way, nominal damages are appropriate when the plaintiff has suffered an injury from the defendant's breach of contract but it is impossible to calculate damages or the damages calculation is based on "speculation or conjecture." *Kleban v. Eghrari-Sabet*, 174 Md. App. 60,

---

[9] Unpublished opinions are for the soundness of their reasoning, not for any precedential value.

95, 920 A.2d 606, 627 (2007).  For example, in *Trabich*, the Fourth Circuit applied Maryland

law and concluded that PFB was entitled only to nominal damages because it did not

demonstrate its lost profits or out-of-pocket expenses with "reasonable certainty."  *Trabich*, 304

Fed. App'x at 228.

As an initial matter, the court deals with Warns' argument that Allstate cannot pursue a

breach of contract claim because it is duplicative of the claim for breach of fiduciary duty.

Warns offers no legal authority for the notion that Allstate may not pursue both claims.  Indeed,

the court is not aware of any Maryland case that stands for this proposition.  Warns' argument on

this point, therefore, will not prevail.

The court turns to the potential remedy for Warns' alleged breach of contract.  Allstate

claims as damages the increase in cases filed against its insureds following Warns' departure,

making the bare claim that those damages exceed $75,000.  Applying Maryland law, Allstate

need not itemize a specific damages amount to maintain a breach of contract claim.

Nevertheless, if Allstate cannot show with reasonable certainty what its damages are, its

potential recovery is limited to nominal damages.  Indeed, even after discovery, Allstate has not

been able to put a number value to the increase in lawsuits filed against its insureds.  Any

calculation of Allstate's damages based on the increase in lawsuits would be based on

speculation.  Accordingly, Allstate may only seek nominal damages, and to the extent it seeks

any other monetary damages, Warns' motion for summary judgment will be granted.

Warns admits that "she was to abide by the Code of Ethics as a condition of her

employment,"[10] but argues that Allstate cannot maintain a claim for breach of contract because

_____

[10] In an earlier opinion, the court refrained from ruling on whether a contractual obligation
existed between Warns and Allstate.  (Op., ECF No. 41, at 19.)  In deciding to delay this ruling,
the court reasoned that Allstate did not contend Warns signed the Code of Ethics or any other

she was not contractually obligated to Allstate after she left her position as a claims adjuster. (Mot. for Summ. J. at 19.)  But if Warns did in fact take files from Allstate, this conduct would have occurred during her employment.  Moreover, this conduct would have violated the Code of Ethics, which provides that Allstate employees may only share proprietary Allstate information with people with a "need to know" and may not appropriate proprietary Allstate information for their own personal benefit.  (*See* Code of Ethics at 19, 24.)  Thus, regardless of whether the Code of Ethics continued to govern Warns' behavior after she left Allstate, she would have breached the Code of Ethics by removing the files from Allstate for her own personal benefit.  Because, as explained above, there is a genuine dispute as to whether Warns removed the files from Allstate, Allstate's breach of contract claim would survive even if the contractual obligation did not continue.  Warns' motion for summary judgment therefore will be granted in part, as to Allstate's claim for monetary damages, and otherwise denied.  Should it ultimately prevail on the breach of contract claim, Allstate will be entitled to nominal damages only.

### b.  Motion to Seal Allstate's Opposition

Allstate moves to seal its opposition to Warns' renewed motion for summary judgment. Local Rule 105.11 requires that a party seeking to seal documents provide specific factual representations justifying the sealing and an explanation for "why alternatives to sealing would

---

noncompete or nondisclosure agreement.  Now discovery has revealed that Warns acknowledged her receipt of the Allstate Code of Ethics, and her agreement to it, in both 2009 and 2010. Accordingly, the court concludes that the Code of Ethics created a contractual obligation between Warns and Allstate.  *Cf. Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 915 (4th Cir.1997) (upholding injunctive relief for a breach of confidentiality claim where a former employee had signed two nondisclosure agreements).  Finally, the court recognizes an inconsistency between Warns' motion for summary judgment and her accompanying memorandum; although she maintains in her motion that "the Code of Ethics [wa]s not a contractual term" of her employment, (*see* Mot., ECF No. 110 at ¶ 5I), Warns seems to state the opposite in her accompanying memorandum. (*See* Mot. for Summ. J. at 19.)  Regardless of whether Warns admits the Code of Ethics created a contractual obligation, the court finds such an obligation was formed when she acknowledged and agreed to the Code in 2009 and 2010.

not provide sufficient protection." Local R. 105.11 (D. Md. 2011); *see Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 120–21 (D. Md. 2009). According to the Fourth Circuit, "[t]he right of access in any given case may vary depending on the nature of the case and the specific item under review." *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 576 (4th Cir. 2004) (citation omitted). The court therefore must determine the public interest in accessing the specific documents at issue. *See Stone v. Univ. of Md. Medical Sys. Corp.*, 855 F.2d 178, 180–81 (4th Cir. 1988). When the document at issue is a dispositive civil motion, such as a motion for summary judgment, the First Amendment applies so that public access "may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Id.*; *see also Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). By contrast, when the document is related to a non-dispositive civil motion, it is not clear whether the First Amendment applies. *See Va. Dep't of State Police*, 386 F.3d at 580 (citations and internal quotation marks omitted) (stating that the court has not held that the public has a First Amendment right to access non-dispositive civil motions, but also stating that "proceedings in civil cases are traditionally open . . . and in some civil cases the public interest in access . . . may be as strong as, or stronger than, in most criminal cases").

As to Allstate's motion to seal its opposition to Warns' renewed motion for summary judgment, Allstate argues that each page of the opposition contains confidential information that, if publicly disclosed, may harm Allstate's business interests as well as possibly Warns or Albright. Allstate therefore maintains that redaction is not a feasible option and would render its papers incomprehensible. As a preliminary matter, the court notes that the more stringent First Amendment test applies to the determination of whether to seal Allstate's opposition, as it relates to a dispositive civil motion. Applying this more rigorous standard, the court determines that

Allstate meets its burden only in part. Exhibit N is properly redacted, but still contains Albright's sensitive financial information—in particular, personal checks and bank statements—that need not be made publicly available. Thus, Exhibit N will be sealed. The remaining documents, however, contain information that is largely summarized in this Memorandum, is not confidential, and is already heavily redacted. The court finds Allstate has not "established *with specificity* that disclosure of the [remaining] material will result in some kind of substantial harm" to its business and "that that harm outweighs both the necessity of the material to dispositive motions practice in this case and the traditional right to public access of judicial documents and records." *Waterkeeper Alliance, Inc. v. Alan & Kristin Hudson Farm*, 278 F.R.D. 136, 142 (D. Md. 2011) (emphasis added) (citation omitted). Indeed, Allstate makes only the sweeping claim that public disclosure of its opposition would harm its business interests. Accordingly, Allstate's motion to seal its opposition will be granted in part, as to Exhibit N, and will be otherwise denied. As it was instructed earlier in the court's February 29, 2012, Memorandum (*see* Op., ECF No. 41, at 32–33), Allstate will be instructed to file proposed redacted versions of the documents at issue, together with the necessary specific factual representations justifying secrecy. *See id.* The temporary seal will remain in place until the redacted versions are approved.

### c. Motion to Strike

Warns moves to strike Allstate's Exhibit N from its opposition to her renewed motion for summary judgment. She argues that a confidentiality agreement—executed in connection with Albright's divorce—precludes Allstate from using as an exhibit cancelled checks and statements from Albright's personal checking account at M & T Bank. The cancelled checks and bank statements were sent, unsolicited, to Allstate's counsel by Albright's ex-wife, Elizabeth Hand.

The agreement at issue, dated September 30, 2011, is entitled "Non-Disclosure/Confidentiality Agreement in Regard to All Discovery, Testimony, and Other Evidence Produced or Otherwise Created in David Albright v. Elizabeth Albright." (*See* Ex. 4, ECF No. 128-2, at 18.) It provides, in pertinent part, that:

> In an effort to resolve the issues between the parties, the Requesters have requested personal financial information from David Albright and financial information from Bennett & Albright, P.A. Mr. Albright and Bennett & Albright desire to receive from the Requesters assurances that such information will not be disclosed for <u>any</u> purpose, other than those specifically set forth herein.

(*Id.* (emphasis in original).) The agreement continues by defining "[c]onfidential [i]nformation" as including, but not limited to, "all documents received from Bennett & Albright, P.A." (*Id.*)

To begin, the court notes that Exhibit N is not relevant to the motion for summary judgment, and the court will not rely on the exhibit in ruling on the motion. It is also unclear how Warns may enforce an agreement between Albright and his ex-wife. In Maryland, an individual does not possess the right to enforce a contract merely because it operates to her benefit; instead, an individual may enforce a contract if she is a party or a third-party beneficiary to the contract. *See CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 457, 56 A.3d 170, 212 (2012) (citation omitted). Here, Warns was neither a party nor a third-party beneficiary to the confidentiality agreement. Simply because the agreement operates to her advantage does not mean she has the right to seek its enforcement. Accordingly, Warns may not move to strike Exhibit N based on the confidentiality agreement between Albright and his ex-wife.[11]

Next, to the extent that Warns' motion to strike is intended to include a motion to disqualify counsel for Allstate, it will be denied. Disqualification is a drastic measure, as it

---

[11] Having decided that Warns may not enforce the confidentiality agreement, it is unnecessary to consider whether the agreement applies only to business information of Bennett & Albright, and not to Albright's personal affairs.

deprives a litigant of her right to choose her own counsel. *Gross v. SES Americom, Inc.*, 307 F. Supp. 2d 719, 722 (D. Md. 2004) (citations omitted). The court must be mindful of the possibility that a disqualification motion may be abused for tactical purposes. *See Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 146 (4th Cir. 1992) (citation omitted). Accordingly, in a motion to disqualify opposing counsel, the movant must satisfy a high standard of proof that disqualification is warranted. *See Buckley v. Airshield Corp.*, 908 F. Supp. 299, 304 (D. Md. 1995); *see also Tessier v. Plastic Surgery Specialists, Inc.*, 731 F. Supp. 724, 729 (E.D. Va. 1990). Only where a lawyer has a conflict that clearly calls into question "the fair and efficient administration of justice" will the court grant a motion to disqualify. *See Gross*, 307 F. Supp. 2d at 723 (citations and internal quotation marks omitted).

Warns falls short of this high standard of proof. She alleges that Allstate's counsel violated Rule 4.4(a) of the Maryland Rules of Professional Conduct, which states that a lawyer shall not "use methods of obtaining evidence that the lawyer knows violate the legal rights of [an individual]." To support this claim, she makes the bare assertion that Allstate's counsel solicited the cancelled checks and bank statements from Hand. Warns likewise offers mere speculation that Allstate's counsel had contact with Hand prior to her sending Albright's financial information. According to Warns, disqualification of Allstate's counsel also is appropriate because they cannot protect their own interests and, at the same time, serve those of their client; however, she offers no explanation of how counsel's interests diverge from the interests of Allstate. Taken together, Warns' conclusions, unsupported by any evidence, do not in any way justify the drastic measure of disqualification.

### d. Motion to Seal Declarations

Allstate moves to seal the declarations of Ackerman and Pfaehler, submitted in opposition to Warns' motion to strike Exhibit N. According to Allstate, the declarations contain sensitive information regarding Albright's business activities as well as personal information regarding Warns. As a result, Allstate maintains that public disclosure of the sensitive and personal information may adversely harm Albright or Warns.

The court agrees only in part with Allstate. In particular, Exhibits 1 and 2 of Pfaehler's declaration contain private financial information for Albright, which—although properly redacted—need not be made publicly available. Even applying the less stringent sealing standard, the court cannot discern any public interest in accessing Albright's personal checks and bank statements. Therefore, the court will seal Exhibits 1 and 2 of Pfaehler's declaration.

The court also will, *sua sponte*, seal Exhibit 1 attached to Warns' motion to strike Allstate's Exhibit N. *See Pacheco v. Sears, Roebuck and Co.*, No. 1:05CV293, 2006 WL 1789140, at *7 n.1 (M.D.N.C. June 26, 2006) (deciding, *sua sponte*, to seal an exhibit). Exhibit 1 contains the same private financial information for Albright included in Exhibits 1 and 2 of Pfaehler's declaration.

As to Ackerman's and Pfaehler's declarations and the remaining documents attached as exhibits, the court need not determine whether the First Amendment standard applies because Allstate does not meet its burden under either standard. The declarations and remaining exhibits contain little, if any, confidential information. Indeed, much of the information contained in those documents is summarized in this Memorandum. The remaining documents, accordingly, shall not be sealed. Allstate will be instructed to file proposed redacted versions of the documents at issue, together with specific factual representations justifying secrecy. *See*

*Waterkeeper Alliance, Inc.*, 278 F.R.D. at 142.  The temporary seal will remain in place until the redacted versions are approved.

## CONCLUSION

For the reasons stated above, Warns' motion for summary judgment will be granted in part and denied in part, Allstate's motion to seal its opposition to Warns' motion for summary judgment will be granted in part and denied in part, Warns' motion to strike Allstate's Exhibit N will be denied, and Allstate's motion to seal the declarations of Ackerman and Pfaehler will be granted in part and denied in part.  Having narrowed the potential relief so that Allstate may seek only nominal damages for the breach of contract claim, and may not seek to bar Warns from working for Bennett & Albright, the court urges the parties to confer with one another.  A conference call with counsel will be scheduled to discuss whether any further proceedings may be necessary.

A separate order follows.


November 12, 2013                                    _____/s/_____
Date                                                             Catherine C. Blake
                                                                    United States District Judge